**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RUBY KAY BALLANCE; TOMMY Y.
BALLANCE,
<u>Plaintiffs-Appellees,</u>

v.

No. 98-1702

WAL-MART STORES, INCORPORATED,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(CA-97-128-5-BR)

Argued: March 5, 1999

Decided: April 21, 1999

Before HAMILTON and MOTZ, Circuit Judges, and
SMITH, United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion. Judge Hamilton wrote
a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Raymond Earl Dunn, Jr., DUNN, DUNN, STOLLER &
PITTMAN, L.L.P., New Bern, North Carolina, for Appellant. Brame
Perry Morrison, Jr., NARRON & HOLFORD, P.A., Wilson, North
Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

In this diversity slip and fall case, a jury found a store negligent and awarded the plaintiffs damages in the amount of $378,300. We affirm.

I.

Ruby Ballance fell while shopping with her two children at a Wal-Mart store in Wilson, North Carolina on December 2, 1994. She and her husband, Tommy Ballance, sued Wal-Mart for damages resulting from the fall. Ballance testified at trial that she entered the Wal-Mart store between 5:00-6:30 P.M. and proceeded to the rear where the sock bins were located. While Ballance was rounding the corner of the aisle, she saw a cardboard box on the floor under the sock bin, which was protruding into the aisle. As she stepped around the box, she fell forward landing on her right wrist and right knee.

Lying on the floor immediately after her fall, Ballance noticed a number of plastic coat hangers on the floor and some underneath her. She also noticed, for the first time, that the protruding box was on its side and contained other plastic hangers spilling out of it. Ballance testified that after she fell a Wal-Mart employee came over to her and said "I get so tired when it gets 5 o'clock in the afternoon. Them stock boys get ready to go, they just go and leave everything right in the middle of the aisle and don't make a difference what's sitting in there." At trial, an expert in retail safety standards testified that Wal-Mart violated its own safety standards in failing to keep the floor hazard-free and clear of all objects, and in not disposing of the extra hangers.

Dr. David Tomaszek, a neurosurgeon who treated Ballance after her fall, explained that Ballance had a number of congenital spine

2

birth defects. Ballance and her husband both testified that Ballance was asymptomatic prior to her fall, but after the fall, she began to experience symptoms consistent with her spinal abnormalities. In Dr. Tomaszek's opinion, the fall caused Ballance to become symptomatic. He noted that her condition was progressive and eventually, if untreated, she would lose mobility and bladder function. He testified that surgery would be necessary to alleviate the symptoms and stop the spinal deterioration. Because the surgery carried some risks, Dr. Tomaszek recommended to Ballance that she forestall surgery until her symptoms advanced.

Anthony Sciara, Ph.D., also testified on Ballance's behalf. Relying on Dr. Tomaszek's diagnosis, Sciara presented two alternative "life care plans" for Ballance. Life care plans are often used in litigation to determine the cost of long-term care. The first plan was based on a scenario in which Ballance had the recommended surgery and her condition stabilized. The other assumed that Ballance became wheelchair-bound.

Wal-Mart put on its own medical expert, Dr. Michael Haglund, who contradicted some, but not all, of the opinions of Ballance's experts.

The jury found for the Ballances, awarding $353,300 to Ruby Ballance and $25,000 in consortium damages to her husband. Shortly thereafter, Wal-Mart submitted a renewed motion for judgment as a matter of law or, in the alternative, a motion for a new trial. The district court denied the motion.

II.

Wal-Mart first contends that Ballance's evidence was insufficient as a matter of law to establish negligence on the part of Wal-Mart. We must determine if "substantial evidence" supports the verdict. See Bryan v. Merrill Lynch, 565 F.2d 276 (4th Cir. 1977). In doing so, we consider the evidence in the light most favorable to the prevailing party, see Andrade v. Mayfair Management, Inc. , 88 F.3d 258, 261 (4th Cir. 1996), recognizing that issues of negligence and contributory negligence are generally best left to the jury, see Smith v. Wal-Mart

3

Stores, 495 S.E.2d 149, 151 (N.C. Ct. App. 1998) (citing Taylor v. Walker, 360 S.E.2d 796, 199 (N.C. 1987)).

To prove negligence under North Carolina law, a plaintiff must show (1) that the defendant negligently created the condition causing the injury or (2) that the defendant negligently failed to correct the condition after notice, either express or implied. See Hinson v. Cato's, Inc., 157 S.E.2d 537, 538 (N.C. 1967). A defendant is not liable for hazards that are open and obvious to the plaintiff. See Wrenn v. Hillcrest Convalescent Home, Inc., 154 S.E.2d 483, 484 (N.C. 1967).

Wal-Mart initially argues that the box was "an open and obvious" hazard for which it cannot be held liable. Ballance admits as much; she acknowledges that she saw the box prior to falling. However, Ballance makes no claim that the box caused her fall. Indeed, at trial she repeatedly asserted that she "never touched the box" and "didn't hit the box." Rather, Ballance testified at trial and asserts on appeal that the hangers caused her fall. An assistant manager at the Wilson Wal-Mart similarly testified that, when he spoke to Ballance immediately after her fall, she told him that "she stepped on a plastic hanger and she fell down."

Thus, Ballance maintains that the hangers, and not the box itself, were the cause of her fall. Wal-Mart does not contend that the off-white colored plastic hangers on the off-white colored floor constituted an open and obvious hazard, but the store nonetheless argues that Ballance cannot recover. Specifically, Wal-Mart asserts that Ballance presented insufficient evidence that (1) Wal-Mart caused the hangers to be on the floor or (2) the hangers were on the floor for a sufficient period of time to provide Wal-Mart with notice of them.

After careful review of the record, we believe that Ballance produced sufficient evidence for a rational jury to conclude that Wal-Mart caused the hangers to be on the floor.[1] Ballance repeatedly testified that the box with the hangers was "sticking out" into the aisle from underneath the sock bin. She recounted that after her fall, she

_____

[1] For this reason, we do not need to reach the question of whether Ballance also produced sufficient evidence that the hangers were on the floor long enough to provide Wal-Mart with notice of them.

4

found the hangers around and under her and that the box, which contained other hangers, was on its side. Ballance testified, without contradiction, that she had not touched the box and thus had not caused the hangers to spill out of it.

Furthermore, Ballance stated that the first Wal-Mart employee to come to her aid, a woman with short black hair and a badge that Ballance thought said "Bresler" on it, told her"I get so tired when it gets 5 o'clock in the afternoon. Them stock boys get ready to go, they just go and leave everything right in the middle of the aisle and don't make a difference what's sitting in there." Although Wal-Mart maintained that its well-trained stock employees would never leave a box filled with hangers on its side spilling out onto the store floor, Wal-Mart did not attempt to refute Ballance's testimony as to Bresler's statement; e.g., the store did not offer Bresler's testimony or proof that it had never employed a Ms. Bresler. Indeed, the testimony of Wal-Mart's witness, Johnnie Jenkins, the assistant manager, entirely accords with Ballance's report of Ms. Bresler's comment. Jenkins conceded that the accident occurred during the week following Thanksgiving, which he recognized was a "very hectic" time for the store.

A defendant is "charged with knowledge of an unsafe or dangerous condition on his premises during business hours created by his own negligence or the negligence of any employee acting within the scope of his employment, or of a dangerous condition of which his employee has notice." Morgan v. Great Atlantic and Pacific Tea Co., 145 S.E.2d 877, 882 (N.C. 1966) (emphasis added). We believe that the above evidence was sufficient to permit a jury to infer that, as a consequence of a Wal-Mart employee's negligent acts, some hangers fell onto the floor. See Kekelis v. Whiten Mach. Works, 160 S.E.2d 439, 443 (N.C. 1968) (plaintiff need not have direct evidence of negligence, but may prove it with circumstantial evidence).

Wal-Mart contends that unless a plaintiff puts forward direct evidence that Wal-Mart employees "caused the coat hangers to spill from the box onto the floor," a claim is insufficient, as a matter of law, to demonstrate negligence. However, the law does not require as much. A plaintiff need only prove that she has suffered an injury which is the reasonably foreseeable result of the defendant's negligent acts.

5

See Winters v. Lee, 446 S.E.2d 123, 124 (N.C. Ct. App. 1994); see also Whitley v. Jones, 78 S.E.2d 147, 152 (N.C. 1953) ("The law requires reasonable foresight, and, when the result complained of is not reasonably foreseeable, in the exercise of due care, the party whose conduct is under investigation is not answerable therefor." (internal quotation marks omitted)). A defendant may be held liable for a negligent act leading to an injury that "a man of ordinary prudence would have known . . . was reasonably foreseeable from this negligent conduct." Hart v. Ivey, 420 S.E.2d 174, 178 (N.C. 1992).

North Carolina law is clear that even if a third party (someone other than Wal-Mart employees) contributed to the injury, the original tortfeasor may still be liable so long as the injury was a reasonably foreseeable result of its actions. For instance, in Hart v. Ivey, the North Carolina Supreme Court held that hosts who served alcohol to an intoxicated minor could be liable to the victim of an automobile accident caused by the intoxicated minor. 420 S.E.2d at 177-78. Because the hosts "knew or should have known" that the minor was intoxicated and would be driving, "the jury could find from such evidence that the [hosts] had done something a reasonable man would not do and were negligent." Id. at 178. Similarly, in Hairston v. Alexander Tank and Equip. Co., 311 S.E.2d 559 (N.C. 1984), the court held that a car dealer could reasonably have foreseen that its negligent failure to properly tighten the lug nuts on a vehicle it sold to the plaintiff would cause the vehicle to become disabled and subsequently struck by another vehicle thus causing injury to the plaintiff. In Brown & Williamson Tobacco Corp. v. CSX Transp. Corp., 882 F. Supp. 511 (E.D.N.C. 1995) (applying North Carolina law), the court denied a defendant railroad summary judgment where the railroad had negligently abandoned some flares in its railroad yard; those flares were picked up by a teenager who later ignited one of the flares setting fire to the plaintiff's warehouse. The court reasoned that "a reasonable and prudent individual could foresee that the abandoned [flares] could be used to harm a second party." Id. at 514. These general principles are even more compelling in the present case because here, unlike in Hart, Hairston, and Brown & Williamson, there is no evidence that a third party (someone other than Wal-Mart employees) was in any way responsible for the hazard.

In sum, it is reasonably foreseeable that leaving a box of hangers on its side partially protruding into a store aisle will result in the

6

hangers being spilled onto the floor of the aisle creating a hazard. Thus a reasonable jury could have found Wal-Mart negligent. See Hastings v. Seegars Fence Co., 493 S.E.2d 782, 785 (N.C. Ct. App. 1997) (holding that issues of foreseeability "are ordinarily best left for resolution by a jury").

III.

Wal-Mart next asserts that the district court erred in failing to grant its motion for judgment as a matter of law on the ground that the evidence established that Ballance was contributorily negligent as a matter of law. A customer has the duty to "(1) see that which can be seen in the exercise of ordinary prudence, and (2) use reasonable safeguards to protect himself." Hinson, 157 S.E.2d at 538. Ballance testified that she did not see any of the hangers on the ground before she fell. An expert testified at trial that a photograph he took of an identical hanger on the floor at the Wilson Wal-Mart demonstrated that "the color of the coat hanger [was] very, very similar to the background [floor]." He further testified, "[a]s a matter of fact, I should say when I was taking this photograph I had to put the coat hanger down on the floor, I got my camera out and I really had to get down and look for the thing. It was amazing how it disappeared on the floor." Because there is no evidence indicating that Ballance was not exercising ordinary prudence when she fell on the hanger, Wal-Mart's contention that she was contributorily negligent as a matter of law lacks merit. See also Kremer v. Food Lion, Inc., 401 S.E.2d 837 (N.C. Ct. App. 1991) (plaintiff acts with prudence while looking at store items on display).

IV.

Finally, Wal-Mart contends that the district court, in failing to limit the testimony of the Ballances' expert medical witnesses, violated the standard for admission of scientific expert evidence set forth in Daubert v. Merrell-Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Daubert instructs district courts to make a "preliminary assessment of whether the reasoning or methodology underlying [expert] testimony is scientifically valid." 509 U.S. at 592-93. Under a Daubert analysis, the district court must determine whether the testimony is

7

"reliable" and whether it is "relevant." Id. at 591-93. The Court suggested the following four factors that a district court should look to in exercising this "gatekeeping function": (1) whether a theory or technique "can be (and has been) tested"; (2) whether it has "been subjected to peer review and publication"; (3) whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." Id. at 593-94.

Recently in Kumho Tire Co. v. Carmichael, ___ S.Ct. ___, 1999 WL 152275 (Mar. 23, 1999), the Supreme Court held that Daubert's "gatekeeping" obligation requires a district court to make a preliminary assessment of all expert testimony, not just"scientific" testimony. Id. at *8-9. Perhaps most significantly for the present case, Kumho makes plain that a district court retains wide discretion in permitting or excluding expert testimony. Thus, in Kumho the Supreme Court reiterated that the district court's decision to admit or deny expert testimony is reviewed only for an abuse of discretion. Id. at *8-11. Furthermore, the Court explained that this discretion is not confined to application of the four factors discussed in Daubert. Id. at *9-10. Rather, the district court has "considerable leeway" to examine any number of factors in determining whether expert testimony is reliable; these factors may include, but are not limited to, the Daubert factors. Id. at *10-11. Thus, the abuse of discretion standard "applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion." Id. at *11.

In Kumho the Supreme Court affirmed the district court's exclusion of testimony by the plaintiff's expert as based on unreliable methodology. The Kumho Court's directives as to the broad discretion to be afforded a district court's determinations concerning the admissibility of expert testimony require that we also affirm the district court's decision as to admissibility, even though here the court admitted the challenged expert testimony.

Wal-Mart contends that Dr. Tomaszek's testimony"relating to the possibility of surgery, the possibility of paralysis, [and] the possible loss of the use of bladder function" should have been excluded as speculative and unreliable because Dr. Tomaszek was not recom-

8

mending surgery until some future date and because Ballance's symptoms were only slowly progressing. Dr. Tomaszek based his opinion that Ballance's condition would progressively worsen and that surgery would be necessary on published medical literature, personal experience with numerous other patients with similar conditions, first-hand observations of Ballance's deterioration, and notes and evaluations of Ballance's other treating physicians. Wal-Mart's medical expert, Dr. Haglund, maintained that there was an 80% likelihood that surgery would be successful; however, even Dr. Haglund conceded surgery could worsen Ballance's condition and that if Ballance did not have surgery, her condition could progress to the loss of bowel and bladder function and the loss of the ability to walk. Clearly, the district court, after conducting a Daubert hearing at which it considered each party's evidence, did not abuse its broad discretion in admitting Dr. Tomaszek's testimony.

Nor did the court err in admitting Dr. Sciara's life care plan testimony. Again, Wal-Mart's claim is that because the life care plans are contingent upon future events and choices (i.e. whether Ballance has surgery and whether it is successful), they are speculative and unreliable. But Wal-Mart's objections simply do not implicate the "reliability" of the opinions of either of the Ballances' medical experts. Those experts testified to the eventual consequences of the disease, the treatment options available to Ballance, the likelihood of success of these options, and the cost of care depending on which option Ballance chooses. Wal-Mart was able to cross-examine the Ballances' experts and put on its own expert to refute their testimony. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky testimony."). In sum, the district court did not abuse its discretion either in permitting plaintiffs' medical experts to testify about the future costs associated with the consequence of Ballance's injury, or in denying Wal-Mart's motion for a new trial based upon this testimony. **2**

_____

**2** Wal-Mart also claims that Dr. Tomaszek's demonstrative use at trial, and introduction into evidence, of a catheter was unfairly prejudicial and violated Federal Rule of Evidence 403. It objects on the same grounds to all of Dr. Sciara's testimony. After careful consideration, we find that the district court was well within its discretion in allowing this evidence.

9

V.

For the reasons set forth above, the judgment of the district court is

AFFIRMED.

HAMILTON, Circuit Judge, dissenting:

Because I disagree with the majority's conclusion that there is sufficient evidence in the record to support the jury's verdict, I respectfully dissent.

Under North Carolina law, a store owner is not an insurer of the safety of its customers. See Smith v. Wal-Mart Stores, Inc., 495 S.E.2d 149, 152 (N.C. App. 1998). Rather, a store owner has the duty to

> keep the aisles and passageways of [its] store, where customers are expected to go, in a reasonably safe condition so as not to expose customers unnecessarily to danger, and to give warning of hidden dangers and unsafe conditions of which [it] knows or, in the exercise of reasonable supervision and inspection, should know.

Rives v. Great Atl. & Pac. Tea Co., 315 S.E.2d 724, 726 (N.C. App. 1984). A store owner is charged with knowledge of a condition which it either negligently created or negligently failed to correct after actual or constructive notice of its presence. See Carter v. Food-Lion, Inc., 488 S.E.2d 617, 620 (N.C. App. 1997); see also Roumillat v. Simplistic Enters., Inc., 414 S.E.2d 339, 342-43 (N.C. 1992). Thus, to establish liability in this case, the Ballances had to prove that Wal-Mart negligently created the condition causing Ruby Ballance's injury, or negligently failed to correct the condition causing Ruby Ballance's injury after actual or constructive notice of its existence.

In their attempt to establish liability, the Ballances contend that Wal-Mart is charged with knowledge of two conditions it negligently created: (1) the box protruding from under the sock bin and into the

10

aisle; and (2) the hangers in the aisle. As to the former condition, the Ballances' case clearly fails, as the majority correctly notes, see ante at 4, because Ruby Ballance testified that the box protruding out from under the sock bin and into the aisle was an open and obvious condition which she observed and appreciated.

Admittedly, the latter condition is a closer question, as Ruby Ballance was unaware of the condition--the hangers lying in the aisle. However, it was incumbent upon the Ballances to prove either that: (1) a Wal-Mart employee negligently created the condition, i.e., placed, or caused to be placed, the hangers in the aisle, or (2) Wal-Mart negligently failed to correct the condition after actual or constructive notice of its existence. In my view, the Ballances failed to prove that Wal-Mart negligently created the condition or had actual or constructive notice of the condition.

The Ballances and the majority rely on the statement of a Wal-Mart employee (Bresler) to Ruby Ballance after the incident. Bresler said: "I get so tired when it gets 5 o'clock in the afternoon. Them stock boys get ready to go, they just go and leave everything right in the middle of the aisle and don't (sic) make a difference what's sitting in there."

For two reasons, Bresler's statement to Ruby Ballance should be disregarded. First, the record contains no evidence regarding what formed the basis of Bresler's knowledge that the stockboys left "everything" in the aisles at 5:00 p.m. There is no evidence as to how long Bresler worked for Wal-Mart (a day, a week, a month, a year?), in what capacity she was employed by Wal-Mart, her position's relationship to the activities of the stockboys, and what gave her superior knowledge of the stockboys' activities. In fact, the record contains no evidence that Wal-Mart ever employed a person by the name of Bresler.

Second, Bresler's statement to Ruby Ballance simply does not suggest, let alone prove, that a Wal-Mart employee was responsible for the presence of hangers in the aisle, or that Wal-Mart had actual or constructive notice of the condition. Indeed, it is unclear exactly what Bresler meant by the word "everything" in describing what the stockboys left in the aisle. Did she mean that every Wal-Mart item found

11

in the aisle at 5:00 p.m. during the "very hectic" week following Thanksgiving at the Wal-Mart store in question was placed there by a Wal-Mart employee and not by one of the thousands of customers that shopped the store during that time? Of course she did not; such a proposition would be absurd. Then, did she mean that certain items, for example, hangers, found during that time were placed there, or caused to be placed, by Wal-Mart employees and not by one of the thousands of customers that shopped the store during that time? In the absence of evidence that Wal-Mart had a persistent problem with the manner in which its stockboys performed their duties, like the jury, I can only guess at what Bresler meant by her statement to Ruby Ballance.

Equally fatal to the majority's analysis is that even if one assumed Wal-Mart's stockboys occasionally left Wal-Mart items in the aisles, this fact does not form the basis to conclude that a Wal-Mart employee was responsible for the presence of the hangers in the aisle, or that Wal-Mart had actual or constructive notice of the condition. Obviously, some other customer could have haphazardly removed some of the hangers from the box, perhaps while trying to hang up a piece of clothing that the customer had tried on, placed the box on its side in doing so, or bumped the box causing the box to lay on its side and allowing the hangers to spill into the aisle. Again, we can only guess as to what caused the hangers to wind up in the aisle.

Over thirty years ago, the North Carolina Supreme Court admonished its lower courts not to engage in guesswork to determine how long a condition existed in a store so as to give rise to store owner liability:

> Even if a negligent situation could be assumed here, had it existed a week, a day, an hour, or one minute? The record is silent; and since the plaintiff must prove her case, we cannot assume, which is just a guess, that the condition had existed long enough to give the defendant notice, either actual or implied.

Hinson v. Cato's, Inc., 157 S.E.2d 537, 538 (N.C. 1967). That admonishment applies equally in the context of determining whether a store owner negligently created the condition causing the injury. In this

12

case, we can only guess as to who negligently created the condition at issue.

In sum, I think the evidence is insufficient to establish that Wal-Mart negligently created the condition at issue, or had actual or constructive notice of it. In the absence of such proof, there can be no liability. Accordingly, I would reverse. Because I would reverse the judgment of the district court, I respectfully dissent.

13